The STATE of Oklahoma, Appellant,

v.

Adolph Honel MUNSON, Appellee.

No. PC–93–887.

Court of Criminal Appeals of Oklahoma.

Dec. 2, 1994.

Joe B. McMillin, Jr., Melrose L. Minton, III, Weatherford, for defendant at trial.

David D. Duncan, Scott Julian, James P. Garrett, Asst. Dist. Attys., Arapaho, for state at trial.

Jack L. Atkinson, R.J. Jacobsma, Asst. Dist. Attys., Arapaho, for appellant on appeal.

David Autry, Richard W. Anderson, William C. Devinney, Sherry T. Wallace, Oklahoma City, for appellee on appeal.

## OPINION

CHAPEL, Judge:

Adolph Honel Munson was charged in Custer County District Court, Case No. CRF–84–129, with First Degree Murder, in violation of 21 O.S.1981, § 701.7; Kidnapping, in

violation of 21 O.S.1981, § 741; and Robbery With Firearms, in violation of 21 O.S.1981, § 801. The State filed a Special Bill of Particulars seeking the death penalty for the murder charge. The Bill of Particulars alleged three aggravating circumstances in support of the death penalty: (1) the murder was especially heinous, atrocious or cruel, (2) the murder was committed to avoid a lawful arrest or prosecution, and (3) Munson constituted a continuing threat to society. Munson was tried by a jury before the Honorable Gary McGinn, District Judge, and was convicted of murder, kidnapping and robbery with firearms. During the capital sentencing phase of the trial, the jury found the existence of two aggravating circumstances [1] and sentenced Munson to death for the murder of Alma Hall. The jury further sentenced Munson to ten (10) years imprisonment for kidnapping and forty (40) years imprisonment for robbery. The trial court imposed judgment and sentence in accordance with the jury's verdict.

Munson filed a direct appeal of his judgment and sentence with this Court. We affirmed Munson's convictions and sentences for murder and kidnapping, but reversed his conviction for robbery with firearms in *Munson v. State.*[2] Munson's petition for rehearing was denied. Munson then filed a petition for writ of certiorari with the United States Supreme Court, which was denied.[3]

On March 10, 1989, Munson filed an application for post-conviction relief with the Custer County District Court. Over the next several years, several amended and supplemental applications for post-conviction relief were filed with the district court. These applications for relief urged, *inter alia*, that Munson should be afforded a new trial because the State had failed to produce certain exculpatory evidence in violation of a court order and due process.

At the request of both the State and Munson, the district court held an evidentiary hearing on August 10–11, 1993 to address the issue of the State's failure to turn over certain exculpatory evidence. At the conclusion of the hearing, the district court issued written findings of fact and conclusions of law, ordered Munson's convictions and sentences be reversed, and directed Munson be afforded a new trial. Relying on *Brady v. Maryland*,[4] the trial court concluded a new trial was warranted because (1) the State failed to reveal to trial counsel that State witness Gerald Klemke underwent hypnosis with an Oklahoma State Bureau of Investigation ("OSBI") agent prior to his testimony at Munson's trial; (2) the State failed to turn over approximately 165 photographs containing exculpatory evidence; and (3) the police and the OSBI withheld approximately 300 to 500 pages of reports containing exculpatory evidence about other suspects in the case.

The State appeals the district court's order. In its appeal, the State does not deny that it failed to turn over reports about the OSBI hypnosis session with Klemke, or that it failed to turn over numerous photographs of the crime scene, or that it failed to provide investigative reports and information about other suspects in the case. Rather, the State simply claims that this evidence is somehow not exculpatory. Such claims by the State are wholly without merit. We now affirm the district court's order.

## BACKGROUND

This case stems from the robbery, abduction and murder of Alma Hall on June 28, 1985. On June 28, Hall was working the midnight to 7:00 a.m. shift at the Love's convenience store in Clinton, Oklahoma. She was last seen in the convenience store at approximately 1:50–1:55 a.m. Around 2:02 a.m., Hall was discovered missing. An investigation revealed that $330 was also missing from one of the store's cash registers.

On the morning of June 28, a blood-stained blouse and a smock bearing Hall's name tag

---

1. The jury found (1) the murder was committed to avoid a lawful arrest or prosecution, and (2) Munson constituted a continuing threat to society.

2. 758 P.2d 324 (Okl.Cr.1988).

3. 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989).

4. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

were found in a ditch alongside a dirt road outside of Elk City, Oklahoma. On July 4, 1985, a female body was found approximately four and one-half (4½) miles northeast of Interstate 40 between Shamrock and McClean, Texas. Dr. Ralph Erdmann,[5] a medical examiner for the State of Texas, examined the body. Erdmann testified that the victim died of two gunshot wounds to the head. Erdmann could not determine whether a .22 caliber bullet caused the wounds, although initially he indicated the entry wound appeared too large to be caused by a .22 bullet. Erdmann claimed not to have recovered any bullets during his examination, although he did recover several rings, a watch and an earring from the body. Erdmann removed the hands from the body. A thumbprint taken from the hands matched Hall's thumbprint.

At trial, the State tied Munson to the abduction and murder of Alma Hall by relying on the following evidence. Shortly before Hall was abducted, Munson, who was serving time in prison for murder, escaped from the Jess Dunn Correctional Center while out on a prison work release program. Witnesses, telephone records and a handwriting analysis of the motel register placed Munson at the Glancy Motel in Clinton, Oklahoma on June 27. Witnesses testified Munson stayed in motel Room 103. By the morning of June 28, Munson had left the Glancy Motel.

The maid who cleaned Room 103 on the morning of June 28 discovered blood-stained sheets and towels in the room. A .22 caliber spent shell was recovered from the room as well as a broken earring which matched the earring found on Hall's body. Another witness recalled hearing a scream and a thud coming from Room 103 around 2:30 a.m. on June 28. Shortly after this incident, the witness noticed an African–American man standing by a car in the motel parking lot.

Munson is African–American. Further, a towel and a tag bearing the brand name "Dundee" were found near the victim's body. The towel and tag were consistent with a towel missing from the Glancy Motel.

No one ever saw Hall at the motel. None of the fingerprints recovered from the room matched either Munson or Hall's fingerprints.

In August, the police found Munson in California and recovered his car there. Police found no bloodstains in the car, and fingerprints taken from the car did not match Hall's fingerprints. However, an OSBI criminalist testified that a strand of hair found in Munson's car matched hair samples taken from Hall.[6]

Finally, the State relied on Donald Bruner, an inmate at the Jess Dunn Correctional Center, who testified that Munson had confided that he escaped from prison, went to "some little town" in Oklahoma, robbed a woman in a convenience store, kidnapped the woman, killed her and dumped her body in a wooded area. Bruner, who was serving fifteen years for second degree murder, testified he did not receive any promises or special treatment for his testimony.[7]

Based on this evidence, the jury convicted Munson and sentenced him to death. However, as Munson and the district court learned at the post-conviction evidentiary hearing, the State did not allow a complete picture of the crime and the evidence to be painted at Munson's original trial.

Before Munson's 1985 trial, defense counsel filed several motions seeking exculpatory evidence, photographs, lists of witnesses, police reports, witnesses' statements and other discovery from the State. At a hearing on the discovery motions, the trial court advised "I feel that anything that the State has in their files regarding the investigation that could help the defense attorneys in any way,

---

**5.** Dr. Erdmann is no longer licensed to practice in the State of Texas. Erdmann has pleaded guilty to seven felonies committed in connection with autopsies he allegedly performed or failed to perform.

**6.** At the post-conviction evidentiary hearing, a defense expert witness testified that the hair

found in Munson car did not match Ms. Hall's hair.

**7.** At the post-conviction evidentiary hearing, it was revealed that in fact the prosecutor had written letters on Bruner's behalf to the state pardon and parole board.

they're just asking for reversal if it's not furnished to the defense attorneys ... So, all I'm going to do is rule that any exculpatory evidence must be furnished, regardless of what law enforcement agency has it ..." (May 3, 1985 Hearing Tr. at 26–27) The trial court further ruled that defense counsel be allowed to view all photographs. Prior to trial the prosecutor assured the trial court that the State was complying with the discovery orders and had provided "copies of all police reports, including Oklahoma State Bureau of Investigation reports from field agents." (June 10, 1985 Hearing Tr. at 5)

Despite the district court's orders and the prosecutor's assurances that the State had complied with those orders, a significant amount of evidence, including police reports and photographs, was not turned over to Munson either before or during trial. In fact, some of this evidence was not turned over to defense counsel until the post-conviction evidentiary hearing, which was held more than eight years after the original trial.[8] This evidence revealed photographs of the crime scene at odds with the State's theory of the case, reports on other suspects and impeachment evidence. After the two day hearing, the district court concluded that suppression of this evidence deprived Munson of his right to a fair trial and that a new trial must be granted.

### REVIEW OF THE DISTRICT COURT FINDINGS

The standard for reviewing a district court's order based on an evidentiary hearing held in a post-conviction proceeding is well-established. "[W]here the trial court conducts an evidentiary hearing in an application for post conviction relief, and the evidence amply supports the court's findings of fact and conclusions of law, such findings of fact and conclusions of law will be adopted by this Court ..."[9]

The question before us is whether the evidence presented at the evidentiary hearing amply supports the district court's findings that the withholding of certain evidence deprived Munson of his right to a fair trial. As stated earlier, the State does not deny that it failed to turn over all this evidence. Rather the State simply contends on appeal that this evidence is not exculpatory. We disagree. The evidence presented at the evidentiary hearing amply supports the conclusion that the evidence suppressed was exculpatory and that a new trial is required.

In *Brady v. Maryland,*[10] the United States Supreme Court held "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." This well-known rule is violated when the prosecution suppresses evidence favorable to the accused and material to guilt or punishment.[11] "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[12]

8. In October 1992, the district court also granted a discovery motion as part of the post-conviction proceedings in this case. Nonetheless, the State did not produce the complete report of the Klemke hypnosis session until the second day of the post-conviction evidentiary hearing and 165 photographs in the possession of the OSBI were also not produced until the evidentiary hearing.

9. *Reed v. State,* 589 P.2d 1086, 1089 (Okl.Cr. 1979); *see also Wesley v. State,* 505 P.2d 1330, 1332 (Okl.Cr.1973); *Miller v. State,* 492 P.2d 370 (Okl.Cr.1971).

10. 373 U.S. at 87, 83 S.Ct. at 1196–1197.

11. *See Bowen v. Maynard,* 799 F.2d 593, 602 (10th Cir.), *cert. denied,* 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986).

12. *Sadler v. State,* 846 P.2d 377, 383 (Okl.Cr. 1993). *See United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (establishing the reasonable probability test for materiality); *Ray v. State,* 758 P.2d 823, 825 (Okl.Cr. 1988).

Prior to the United States Supreme Court decision in *Bagley, supra,* which sets out the current test for materiality, the standard for determining materiality for suppressed evidence that was specifically requested by the defendant was whether the evidence might have affected the outcome of the trial. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). As will be demonstrated *infra,* in this case the suppressed evidence is material under either the *Bagley* test or the *Agurs* test.

In this case, the trial judge relied on three separate categories of material that the State failed to turn over to defense counsel to support his conclusion that Munson's judgment and sentence must be reversed and remanded for a new trial. First, the trial court concluded that the State willfully and deliberately withheld evidence of the OSBI hypnosis session with Gerald Klemke, the Glancy Motel manager. There is no question that the State withheld information that it hypnotized Klemke to enhance his ability to identify Munson's car. This Court has found that "hypnosis, as a technique of memory retrieval, does not meet the evidentiary standard of 'general scientific acceptance.' We have concluded that science has not established hypnosis as a reliable memory-enhancing technique; in fact, the forensic use of hypnosis is fraught with danger." [13] Identification or evidence procured through post-hypnotic memories is inadmissible.[14] In Munson's case, if defense counsel had been supplied with the information of Klemke's hypnosis session, he could have tried to suppress evidence tainted by the hypnosis, or, at a minimum, use this information to impeach the reliability and quality of Klemke's memory.[15]

The State tries to discount its error in failing to reveal this information by arguing that the hypnosis concerned only Klemke's identification of Munson's car and Klemke did not identify Munson's car at trial. The State is wrong. Klemke did identify Munson's car at trial and this evidence could have been used to impeach one of the State's identification witnesses. Moreover, as the State revealed at the evidentiary hearing, the tape of the hypnosis session is inaudible and the full extent of the matters discussed at that session cannot be known with any clear certainty. The trial court correctly concluded that the State willfully, deliberately and improperly withheld this evidence.

Secondly, the trial court found that the State suppressed 165 photographs that were in the possession of OSBI. Although these photographs contain exculpatory evidence, defense counsel was not provided the photographs until the post-conviction evidentiary hearing held in August 1993. Again, the State does not deny that it failed to turn over the photographs as required by court order, but simply avers that the evidence was not exculpatory. We disagree.

Among the numerous suppressed photographs are photographs of tire marks found at the crime scene, photographs of the tires on Munson's car, and photographs of possible lead or copper projectiles found near the body. These photographs challenge the State's theory of how Hall was murdered and by whom. Some of the photographs suggest that there was a bullet found near the body, which would be inconsistent with the State's theory of the case and inconsistent with the testimony of several of the State's witnesses. Further, the tire tracks at the scene where the body was found and the tires on Munson's car are arguably inconsistent. That evidence raises serious questions about Munson's presence at the site where Hall's body was found. Such evidence is not only favorable to the accused but also material. The State was obligated to turn this evidence over to Munson.

Finally, the trial court concluded that the State withheld 300 to 500 pages of police and OSBI reports regarding other suspects in the case. These suppressed reports reveal that several witnesses identified two Caucasian or Mexican men in the Love's convenience store near the time of the robbery and abduction of Hall. Of particular importance were the reports regarding suspect Ralph Yeary. The suppressed reports revealed that Ralph Yeary, who was suspected of involvement in other robberies and abductions of convenience store clerks, was initially a key suspect in this case. At the evidentiary hearing, one witness identified Yeary as one of the men she saw in the convenience store the night of the Hall abduction. Before Munson's original trial, defense counsel had no-

---

**13.** *Harmon v. State,* 700 P.2d 212, 214 (Okl.Cr. 1985) (citations omitted).

**14.** *Id.*

**15.** Failure to disclose impeachment evidence that is material and favorable to the defense violates a defendant's right to due process and a fair trial. *United States v. Bagley, supra.*

ticed Yeary's name on the OSBI reports to which he had been given access. When defense counsel pressed for further information about Yeary, he was advised that Yeary was not a viable suspect because he was in jail at the time of the Hall abduction. This was not true. Yeary was believed to be in Oklahoma around the time of the Hall abduction. Yeary was arrested in Corpus Christi, Texas on June 29; Hall was abducted from the Love's convenience store in the early morning hours of June 28.[16]

The State argues in its brief that the evidence of the other suspects would not have affected the outcome of the case because "[i]dentity was not an issue in this case." It is hard to imagine how the State can make such a claim. Who robbed, abducted and killed Alma Hall was the key issue in this case. Evidence which placed two other men in the convenience store at or near the time of the abduction and robbery would be critical to the defense of this case and could have been used to discredit the police investigation and the State's theory of the case.[17] The State's failure to provide this evidence undermines our confidence in the outcome in this case.

Given the wealth of exculpatory evidence suppressed by the State, we are left with the inescapable conclusion that Munson was deprived of his right to a fair trial and due process. Accordingly, the order of the district court is **AFFIRMED.**[18]

LUMPKIN, P.J., JOHNSON, V.P.J., and LANE and STRUBHAR, JJ., concur.

---

**16.** Notably, not one witness placed Munson at the Love's convenience store. Not one witness identified Munson's car near the convenience store.

**17.** *See Bowen,* 799 F.2d at 612–613.

**18.** Because the Court affirms the district court's order, it is not necessary to address the additional grounds for relief set forth in Munson's brief.